UNITED STATES of America,
Plaintiff-Appellee,

v.

Timothy Shawn BURNS, Defendant-
Appellant.

No. 251-69.

United States Court of Appeals,
Tenth Circuit.

Aug. 10, 1970.

See also D.C., 296 F.Supp. 162.

Richard E. Hartman, Denver, Colo.,
for appellant.

Leonard Campbell, Asst. U. S. Atty.
(James L. Treece, U. S. Atty., and Dav-
id L. Osborn, Asst. U. S. Atty., on the
brief), for appellee.

Before PHILLIPS, BREITENSTEIN
and HICKEY, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Burns was charged by indictment re-
turned June 5, 1968, with failing to com-
ply with the order of his local draft
board to report on October 10, 1967, for
induction into the armed forces of the
United States, in violation of 50 U.S.C.
App. § 462(a). From a judgment of
conviction on a jury verdict of guilty, he
has appealed.

Burns registered with his Local Selec-
tive Service Board No. 12 in Grand
Junction, Colorado, on April 14, 1965.
At that time he completed a Classifica-
tion Questionnaire, SSS Form No. 100,
but left blank that portion of the form
for claiming exemption as a conscien-
tious objector. He was classified as I-
S-H, as a high school student. In No-
vember 1965, he had become a college
student, and was classified as II-S and
given a deferment for one year. On
September 21, 1966, he was sent an In-
formation Questionnaire, SSS Form No.
127, which he filled out and returned on
September 22, 1966, and in which he
stated that he was a full-time student at
Mesa Junior College, Grand Junction,
Colorado. In October 1966, a Current
Information Questionnaire, SSS Form
No. 110, was sent to him, which he
did not return  On November 2, 1966,
he was classified as I-A, because his
grades did not meet the minimum then
required for college deferment.

After being advised of his reclassification as I–A, Burns did not request a personal appearance before the Local Board with respect to such I–A classification, and he did not appeal from such classification. He testified at his trial on November 19, 1968, that he received notice of his classification as I–A; that he read and understood that part of the notice which informed him of his right to appeal, and that he knew he had such right. He further testified that "right after" he received the notice of his I–A classification early in November 1966, he went to the office of the Local Board and had a conversation with Pearle Seals, Executive Secretary of the Local Board;[1] that he asked her the reason for the I–A classification, and that she responded that he "was not in the upper two-thirds of the class" in his "first year in school"; that he then asked her "what recourse you had then if you were a pacifist and didn't believe in killing. What recourse you had"; that she asked him if "he belonged to a religion" and he told her he "had been raised as a Catholic"; that her reply was that "there were Catholic priests in the front lines" and that he "had no excuse"; that he "was just out of luck"; and he further testified that she did not give him any form to fill out.

At the trial, Pearle Seals testified she had no recollection of Burns coming to the Selective Service Board office in November 1966, nor of the conversation with Burns, to which he had testified, but that many registrants came to the office and asked questions and "it could have happened."

On August 24, 1967, in response to an order of the Local Board, Burns appeared for a pre-induction physical examination, was examined, and found acceptable for military service.

On September 27, 1967, he was ordered to report for induction on October 10, 1967. The induction order was mailed to Burns at the last address reported by him, but the file shows it was returned for want of a forwarding address. However, Ray Hickman, a Special Agent of the F.B.I., residing at Grand Junction, testified he contacted Burns on February 20, 1968, at Montrose, Colorado; that he advised Burns fully as to his rights, and that he gave him a written explanation of such rights; that Burns read it and then signed a written waiver of such rights. At the trial, the written statement of Burns and the waiver signed by him were admitted in evidence, after counsel for Burns stated he had no objection thereto. Hickman further testified he advised Burns his inquiries were with respect to Burns's failure to report for induction; that he specifically asked Burns if he received the notice to report for induction, and Burns stated that he had received it. Burns was not under arrest at the time he was interrogated by Hickman.

In his testimony, Burns did not deny he told Hickman he received the notice to report for induction, and he did not contend at the trial that he did not receive such notice.

Burns failed to report for induction on October 10, 1967, or at any time thereafter, and he told Hickman he did not intend to report for induction.

Hickman swore to a complaint before a United States Commissioner on February 21, 1968, charging Burns with failure to comply with his local Selective Service Board's order to report for induction. The complaint was duly filed and a warrant was duly issued and Burns was arrested by Hickman on February 21, 1968.

Hickman further testified that when he talked with Burns in February 1968, Burns stated specifically "that he was not a conscientious objector"; that "he was quite adamant on this point"; that he described himself as a "pacifist an-

---

1. She stated that was her title when she testified at the trial, and we will refer to her herein as "Executive Secretary," although she signed official letters set forth in the record as "Pearle B. Seals, Clerk Local Board No. 12."

archist" and said "he did not believe anybody should tell anybody else what to do under any circumstances." In his testimony at the trial, Burns did not deny making such statement to Hickman.

In his direct examination, Burns was asked how he felt "about serving in the army; about serving in something that is near the army; not fighting, but near the army." In reply thereto Burns said, "Well, my respect and my love for life is so great that for no reason can I snub life out in any form, and war is exactly the snuffing out of lives of other men and organizations such as our military organization, the army—their purpose for existing is ultimately to destroy life, and the Selective Service is a branch of the armed services, in that it does filter people into the military organizations, is a servant of killing, and for that reason I would have to object not only to the military but any participation of the Selective Service because by participating in what they do *I am guilty of murder*." (Italics ours.)

He was then asked, "Is that the extent of your feeling?" He replied, "That's basically the way I feel." When asked, "When did this feeling crystalize?" he stated, "Well, it's hard to say. It's been with me all my life. I didn't realize it. I had suspicions of it around the time I was seventeen, I think, but all my life I felt that it was there, but I intellectually —I didn't realize what it was until perhaps the past two years that I became to realize that—what the feeling meant." ["You say the past two years—"] "The past two and a half years."

On cross-examination, Burns testified, "I feel that any law which promotes life and love should be obeyed. Any law which negates that should not be obeyed. * * * I think that the law of love is the primary law to follow and when other laws go against that, I have a duty to disobey." When asked if he knew he was violating the law when he refused to report for induction, he stated, "No. I was not bound by that law asking me to negate life."

Pearle Seals testified that in all matters of mailing out notices and questionnaires she acted in accordance with directions given to her by the Local Board, although the file does not show that there was any written resolution which authorized her to send out orders.

We withheld handing down our opinion in this case until the decision of the Supreme Court in Welsh v. United States (decided June 15, 1970), 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308.

In that case Welsh was convicted "of refusing to submit to induction into the Armed Forces in violation of 50 U.S.C. App. § 462(a)" (62 Stat. 612) and "on June 1, 1966," was "sentenced to imprisonment for three years." Hence, his order to report and refusal to submit to induction occurred prior to the June 30, 1967, amendment of § 6(j), (50 U.S.C. A. App. § 456(j)). The pertinent part of § 6(j) prior to such amendment read:

"(j) Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." (62 Stat. 612–613)

The Local Board ordered Burns to report for induction on October 10, 1967. The indictment, which charged him with failing to comply with such order and failing to report and submit to induction, was returned on June 5, 1968. While he was classified as I–A on November 2, 1966, the offense with which he was charged and of which he was convicted was committed on October 10, 1967, after the 1967 amendment was enacted and had become effective.

While there is some intimation in the legislative history of the 1967 amend-

ment that Congress intended thereby to narrow the construction placed on the phrase "religious training and belief" in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733, we find it difficult to see any basis for such Congressional intent in the language used. There is no substantial change in the language used, except the omission in the amendment of the following language:

"Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation."

It will be observed that the first sentence of the part here pertinent of § 6(j) was not changed by the amendment, and that the exclusionary provision was not substantially changed by the amendment. We therefore, are of the opinion that if and when the Supreme Court comes to construe the 1967 amendment, it will adhere to its decisions in Seeger and Welsh.

Moreover, we believe it will do so, if necessary, to avoid holding § 6(j) unconstitutional, and to preserve "a policy" that "has roots so deeply embedded in" our national "history," so ably stated by Mr. Justice Harlan in his concurring opinion in Welsh.

It was in November 1966 that Burns had his conversation with the Executive Secretary of the Local Board, the effect of which is the crux of this case, and had Burns not been misled by the advice that she gave him, he would have had a long period of time before the enactment of the 1967 amendment to apply for classification as a conscientious objector under § 6(j), as it was construed in Seeger. Indeed, Burns testified that he did not file a claim for exemption as a conscientious objector, because the Executive Secretary told him he had no basis for such a claim, and "there was nothing" he "could do."

It is true that Burns told the F.B.I. Agent he was not a conscientious objector, but that was after the Executive Secretary had misled him as to the requirements to constitute a conscientious objector, and which, because of her statements to him, he believed he lacked. When Burns told Hickman he was not a "conscientious objector" he no doubt was interpreting that term in the light of what the Executive Secretary had told him. As the Supreme Court said in Welsh: " * * * very few registrants are fully aware of the broad scope of the word 'religious' as used in § 6(j), * * *." We think Burns's statement at the time and under the circumstances it was made had the ring of frankness and sincerity.

In Welsh v. United States (decided June 15, 1970), 398 U.S. 333, 90 S.Ct. 1792, the court said:

" * * * What is necessary under Seeger for a registrant's conscientious objection to all war to be 'religious' within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions. * * * If an individual deeply and sincerely holds beliefs which are purely ethical or moral in source and content but which nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by * * * God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption under § 6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions."

The decision in Seeger was handed down on March 8, 1965, about one year and eight months before the conversation between Burns and the Executive Secretary took place. But, as stated in Welsh, " * * * very few registrants are fully aware of the broad scope of the

word 'religious' as used in § 6(j), * * *."

While Burns did not use the phrase "conscientious objector" in making his inquiry of the Executive Secretary, he did ask "what recourse you had then if you were a pacifist and didn't believe in killing." Her statement to Burns showed she understood his inquiry was with respect to his right to exemption as a conscientious objector. In answering him, the Executive Secretary made three mistakes. First, she should not have undertaken to advise him, but should have given him Special Form for Conscientious Objector (SSS Form No. 150) and told him to complete it and file it with the Board; second, she erroneously gave Burns to understand that his belief that he should not engage in killing in war had to be based on religious training and belief derived from an organization traditionally and conventionally regarded as religious in character, and which taught opposition to war; and third, that the Catholic church was not such an organization.

Seeger made it crystal clear that Congress did not intend to include only organizations that expressly teach opposition to war, as the Quaker church, for example.

We are of the opinion that had not the Executive Secretary given Burns the erroneous advice, and had she given him SSS Form No. 150, he would have completed it and set forth therein that he was conscientiously opposed to serving directly or indirectly in combatant training and service in the armed forces of the United States, because of his beliefs, to which he testified at his trial; and that if the Local Board was convinced of his sincerity as to his asserted beliefs, it would have granted him an exemption and would have reclassified him accordingly.

Hence, we conclude that the erroneous advice given him by the Executive Secretary so misled him that he believed it was useless to file a claim for exemption as a conscientious objector and have it passed on by the Local Board prior to June 30, 1967, and caused Burns to lose thereby very important rights.

Accordingly, we reverse the judgment of conviction in order that Burns may have an opportunity to file a claim as a conscientious objector, have it passed on by his Local Board, and reviewed on appeal, if the Board's action should be adverse to him. Of course, he should file such claim within a reasonable time. If he fails so to do, or the final administrative action is adverse to him with respect to his claim as a conscientious objector, his classification as I–A will stand and he will again be subject to an order to report for induction.

Reversed.